UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Case No. 15 CR 525 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| STEVEN SEGURA | ) | |

**GOVERNMENT'S SENTENCING MEMORANDUM**
**REGARDING DEFENDANT STEVEN SEGURA**

The UNITED STATES OF AMERICA, by and through its attorney, JOHN R. LAUSCH, JR., United States Attorney for the Northern District of Illinois, respectfully submits the following sentencing memorandum. The government agrees with the PSR that the advisory Sentencing Guidelines range in this case for the defendant is 24 to 30 months' imprisonment. As set forth below, the government recommends a sentence for the defendant within the advisory Guidelines range.

**I.  OBJECTIONS/CORRECTIONS TO THE PSR**

PSR ¶ 70:  This portion of the PSR appears to misstate the procedural history and mental health diagnoses of Segura, including the Court-ordered psychiatric evaluation. Specifically, the PSR states, "On June 12, 2017, at the direction of pretrial services, a psychiatric evaluation was conducted by Dr. Madiha Shabbir of St. Mary and Elizabeth Hospital in Chicago." PSR ¶ 70. Rather, although Segura did receive counseling and treatment at St. Mary and Elizabeth Hospital in 2017, the Court on June 8, 2017, ordered Isaac Ray Forensic Group, LLC, (as jointly recommended by Segura and the government) to conduct a psychiatric evaluation of Segura. Dkt. 49. In response, Dr. Goldstein of Isaac Ray Forensic Group, LLC,

performed the ordered evaluation and provided her findings to the Court and the parties on September 3, 2017 ("Competency Evaluation"). Dr. Goldstein concluded that Segura is legally competent and that Segura "is likely experiencing some veritable symptoms of both depression and anxiety" in addition to an alcohol use disorder. *See* Competency Evaluation at 21-22. In addition, Dr. Goldstein concluded about Segura, among other things:

- Segura responded to emotional functioning tests with "such extreme exaggeration of psychiatric symptomatology" that the "measures were invalidated as a result . . . clinical scales are simply invalid for interpretation, and it is clear from meeting Mr. Segura in person that he does not suffer from the range of severe psychiatric symptoms he endorsed on these measures." *Id.* at 18.

- "In Mr. Segura's case, not only is there a recent/active Alcohol Use Disorder in the clinical picture limiting a clear diagnosis of symptoms, there is also a significant embellishment of these psychiatric symptoms on Mr. Segura's part, which in my opinion is intentional, and is malingering." *Id.* at 20.

- "There is ample evidence of malingering of psychiatric disorder in Mr. Segura's case. However, a partial malingering picture best describes Mr. Segura's psychiatric status in that he does appear to be experiencing some veritable depressive and anxiety symptoms at this time." *Id.* at 20.

- "Without exception, Mr. Segura's [VSVT cognitive test] scores are most consistent with individuals feigning/simulating neurologic disorder." *Id.* at 14.

- "Malingering of cognitive impairment cannot reasonably be ruled out in Mr. Segura's case. It is in fact the most parsimonious explanation for Mr. Segura's cognitive test performances." *Id.* at 19.

- "Mr. Segura proved himself an unreliable historian during the examination here, and attempted to malinger both psychiatric disorder and cognitive impairment." *Id.* at 20.

2

- "Based on the above considerations, a conclusion of full malingering would not be unreasonable. But I suspect there is a partial malingering picture presently . . . More information is simply necessary to determine whether he is falsely, and intentionally, attributing these symptoms to PTSD . . ." *Id.* at 21.

## II. BACKGROUND[1]

Defendant Steven Segura, a Chicago Police officer, presented false claims to the Internal Revenue Service by filing multiple trust tax returns tax years 2007, 2008, and 2009. More specifically, beginning in February 2010, and continuing through February 2011, the defendant, while employed as a Chicago Police officer, repeatedly submitted false "Form 1041 United States Income Tax Return for Estates and Trusts." In total, defendant falsely claimed refunds in the amount of $1,041,161, to which his purported "Steven Segura Trust" was not entitled. In response to his false claim for tax year 2008, Segura received a refund of $300,000 from the U.S. Treasury, which he deposited in a bank account and promptly spent. Defendant knew he was not entitled to this massive check.

To carry out his scheme, on March 6, 2010, defendant filed Form 1041 trust returns in the name of his bogus "Steven Segura Trust" for tax years 2007 and 2008. In each return, defendant knowingly made materially false statements regarding total income, fiduciary fees, and taxes paid. In addition, in each return, defendant

---

[1] The facts summarized below are set forth in more detail in the Presentence Investigation Report for Steven Segura ("PSR") as well as the Government's Version of the Offense ("GVO") and attached exhibits.

3

falsely claimed a refund for his purported trust in the amount of $300,000, knowing Defendant signed each return under penalty of perjury.

On September 2, 2010, defendant again filed a Form 1041 returns in the name of his purported trust for tax years 2007 and 2008. Once again, in each of these trust income tax returns, defendant knowingly made materially false statements regarding the total income, fiduciary fees, and tax paid, and in each return falsely claimed a $300,000, knowing that the purported trust was not entitled to any refund. Approximately five days later, on September 7, 2010, defendant filed another return for tax year 2009 for his phony trust. Defendant again signed his return under penalty of perjury, repeated the same bogus information, and this time, falsely claimed a refund in the amount of $441,161.

On October 18, 2010, defendant caused the U.S. Treasury to issue a check in the amount of $300,000, payable to Segura's purported trust for the tax year 2008. On January 19, 2011, defendant opened an account at JPMorgan Chase Bank in the name of the "Steven Segura Trust." *See* GVO, Ex. A (Defendant's Bank Records). The same day defendant endorsed and deposited the fraudulently obtained $300,000 Treasury check into his account at JPMorgan Chase Bank. *Id.* Defendant knew that no refund, let alone $300,000, was due to him. He also knew that the income tax return which he had filed with the IRS in order to generate this $300,000 check was fraudulent to the core.

Defendant rapidly spent the $300,000 in fraudulent proceeds. Between the

4

date of deposit (January 19, 2011) and February 27, 2011, Segura withdrew approximately $100,822.03 from his Chase account. *Id.* On January 31, 2011, Segura used a large portion of the fraud proceeds to buy himself a Jaguar convertible for $52,798.08. *See* GVO, Ex. C (Vehicle Records). Segura's bank statement ending July 14, 2011, shows that he continued to spend the fraud proceeds rapidly and lavishly in the initial months after his deposit, such as: $935.23 on April 2-3, 2011, at Aldo, Gap, DKNY, and Kenneth Cole; $458.95 at Sunglasses Hut on April 15, 2011; $2,5571.10 on airfare and travel between May 18, 2011, and May 27, 2011; between June 15, 2011, and July 11, 2011, Segura spent $4,680.22 on, among other things, Vintage Lounge, Delta Air, Sound Bar, and NV Penthouse Lounge. *See* GVO, Ex. A (Defendant's Bank Records). By December 13, 2011, $238.47 was all that remained in Segura's bank account of the $300,000 in fraudulently obtained Treasury funds. *Id.*

### III. ADVISORY SENTENCING GUIDELINES

The government agrees with the Probation Office's calculation of the Guidelines. The total offense level is 20, pursuant to U.S.S.G. §§ 2T1.1(a)(1), (c)(1) and 2T4.1(H), because the defendant's total intended loss is $1.04 million. Defendant's criminal history category is I. Therefore, the advisory sentencing guidelines range is 24 to 30 months.

## IV. APPLICATION OF SENTENCING FACTORS

Section 3553(a) requires courts to impose a sentence that is "sufficient, but not greater than necessary," to comply with the purposes of sentencing.[2] One of those factors is the advisory range set by the Sentencing Guidelines, and another is the Commission's policy statements. Section 3553(a)(4), (a)(5). Although the Sentencing Guidelines are advisory only, "[a]s a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). For the reasons explained below, the government requests that the Court sentence defendant to a period of incarceration within the advisory guidelines range after consideration of the sentencing factors set forth in 18 U.S.C. § 3553(a).

### A. The Seriousness and the Nature and Circumstances of the Offense.

Segura's crime is serious and worthy of a substantial term of imprisonment. This was not a one-time lapse of judgment; defendant executed a well-thought-out scheme over the course of months, which allowed ample opportunity for defendant to contemplate his conduct. As noted above, defendant perpetrated this serious offense by filing multiple false tax returns, all of which he knew were completely bogus. A

---

2     Those purposes are the need for the sentence "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2)(A)-(D).

sentence at within the Guidelines range is appropriate and would reflect the seriousness and the nature and circumstances of the offense.

B.     History and Characteristics of the Defendant.

In mitigation, defendant has devoted many years to service. Segura "rose to the rank of Sergeant" in the United States Army, and thereafter "became a Cook County Sheriff Deputy and a Chicago police officer, where he service his community as a first responder earing citations for meritorious service and valor." Dkt. 59 at 8. Segura has also strived to pursue educational goals, most recently obtaining a Master's degree in business administration in 2014. PSR ¶ 79. Segura has also overcome difficult circumstances, including a turbulent youth. PSR ¶¶ 53, 55.

However, despite his achievements and service rendered, it remains the case that Segura committed a serious crime. Additionally troubling—and aggravating— is that Segura engaged in such conduct while employed as a Chicago police officer. Indeed, defendant used his status as an officer in ways that not only enabled his own criminal conduct, but that also furthered negative conduct by others.[3]

---

[3] For example, G.A., the Chase Bank employee who set up Segura's account on January 19, 2011, told agents, among other things, that G.A. was concerned that Segura's $300,000 check was fraudulent, but G.A. was "comforted by Segura's lack of concern that the funds would not be immediately available and that Segura told her he would make yearly deposits of the same nature." *See* GVO at Ex. B. According to G.A., Segura identified himself as a Chicago police officer when he opened his bank account and deposited his $300,000 check. *Id.*

Also, Christopher Mietus recalled attending a meeting where Segura, whom Mietus recalled was a Chicago Police officer, spoke about what do if one has to go to court and how to get out of legal situations. *See* GVO at Ex. D. More specifically, Mietus recalled that, when Segura spoke at such meetings, Segura would have the

Defendant appears to blame much of his conduct on his apparent use of alcohol to excess and his mental health. *See, e.g.* PSR ¶ 76; Dkt. 59 (Plea Declaration) at 8. The government is in no way trivializing or dismissing the fact that, throughout the course of Segura's personal and professional life, he has, like so many others who come before this Court, endured problems that have impacted his well-being. That being said, it warrants emphasis that the past events and supposed resulting afflictions (that Segura seems to suggest contributed in some fashion to his criminal conduct) are assertions of questionable veracity from an "unreliable historian." Competency Evaluation at 21.[4]

---

members practice how to deal with court situations, including how to get out of credit card debt and gun charges. *Id.* In addition, according to Candace Lukes, Segura looked at notices she received from the IRS and informed her that he (Segura) did it all the time and that he knew how to handle the problem. *Id.* Segura charged Lukes $4,500.00 in cash and told her what to write on the IRS paperwork and to send it back to the IRS. *Id.* Lukes met with Segura approximately 20 times at his home. *Id.* According to Lukes, Segura told her "what to write on each notice or bill she received." *Id.* Segura helped Lukes "numeorus times with various notices, and he always had her pay him in cash for his services." *Id.* Segura also instructed Lukes to take all of the refund money out of her account via cashier's check so the government could not "freeze it." *Id.* Months later, Segura instructed Lukes to redeposit the funds and to withdraw them in smaller amounts. *Id.* Lukes estimated that "over the course of [Segura] helping her with the IRS mailing, she paid him approximately $45,000.00 in cash." *Id.*

[4] Notably, Segura appears to suggest that an alleged previous assault somehow contributed to his conduct or at least is somehow a mitigating fact. Dkt. 59 (Plea Declaration) at 8. However, as Dr. Goldstein observed, Segura is not a reliable source of information as demonstrated, in part, by his full or partial malingering of history and symptoms:

> Not only is Mr. Segura facing serious criminolegal charges, for which he may be incarcerated, but he is attempting to seek benefits for claimed PTSD symptoms from the V.A. for an alleged [incident]that occurred in 1994, of which

However, even accepting Segura's claims as true about his past and his afflictions, then, the Court should also consider that those same aspects of defendant's life did not prevent him from being an award-winning officer and a successful MBA graduate. Clearly, defendant has demonstrated the capacity to function at a high-level professionally and in school despite whatever prior difficulties he has endured. Any previous turmoil in Segura's life does not explain, justify, or mitigate this crime. The only explanation is that defendant committed this fraud to enrich himself. As a result, a sentence within the advisory Guidelines range is appropriate.

---

there is no mention in any available record, and for which he has never sought treatment until very recently, in the same time period he lost his CPD salary and benefits. Whether the events in 1994 actually occurred as he described cannot be determined based on currently available information. However, Mr. Segura proved himself an unreliable historian during the examination here, and attempted to malinger both psychiatric disorder and cognitive impairment. This simply must be considered when assessing the veracity of such a claim, given its timing and the context in which it has arisen.

Based on the above considerations, a conclusion of full malingering would not be unreasonable. But I suspect there is a partial malingering picture presently, and that Mr. Segura is likely experiencing some veritable symptoms of both depression and anxiety. More information is simply necessary to determine whether he is falsely, and intentionally, attributing these symptoms to PTSD for purposes of obtaining disability benefits, or some consideration from the Court in the instant matter, as opposed to these symptoms being the natural consequence of more recent and serious life-changing events and losses that will significantly impact him and his family in the future.

Competency Evaluation at 20-21.

### C. A Guideline-Range Sentence Appropriately Reflects the Need for the Sentence Imposed to Afford Adequate Deterrence and Promote Respect for the Law.

The government respectfully submits that a prison term within the Guidelines range for the defendant is necessary to achieve the goals of deterrence and to promote respect for the law. The Guidelines specifically recognize that general deterrence is a crucial goal in sentencing for criminal tax offenses, as the Sentencing Commission explained:

> The criminal tax laws are designed to protect the public interest in preserving the integrity of the nation's tax system. Criminal tax prosecutions serve to punish the violator and promote respect for the tax laws. Because of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the tax laws is a primary consideration underlying these guidelines. Recognition that the sentence for a criminal tax case will commensurate with the gravity of the offense should act as a deterrent to would-be violators.

U.S.S.G. § 2T1.1 (intro. comment.). See *United States v. Townsend*, 520 Fed.Appx. 473, 476-77 (7th Cir. 2013) (tax sentences were substantively reasonable where the sentencing court "declined to impose a below-Guidelines sentence, emphasizing the need to deter abuses of the tax system," and instead imposed Guidelines sentences on two defendants of 24 months' and 46 months' imprisonment, respectively); *United States v. Warner*, 792 F.3d 847, 860-61 (7th Cir. 2015) (where Seventh Circuit noted, "we have no quarrel with the general proposition that effective deterrence of tax crimes requires a credible threat of imprisonment").

Concerning the need for general deterrence, offenses such as this are

frequently the subject of a cost-benefit-analysis in which the offender weighs the rewards with the risk of apprehension and punishment. In this regard, if this conduct is not punished adequately, it encourages the like-minded to commit similar offenses. Moreover, our tax system is by and large a self-reporting system, which depends upon the honesty of actors such as the defendant. Thus, if the tax system is allowed to be corrupted by individuals like the defendant without sufficient consequences, it will erode the entire system. A substantial prison term will convey to Segura—and to other similarly situated individuals—that taking money through fraud is unacceptable and that such conduct will result in severe consequences. For these reasons, a guideline-range sentence is necessary to achieve the goal of deterrence and to promote respect for the law.

## V. SUPERVISED RELEASE AND RESTITUTION

Finally, the government agrees with the Probation Officer's suggested conditions of supervised release, and the reasons stated for imposing these conditions, should a term of supervised release be a part of each defendant's sentence.

As referenced in the PSR, defendant should be ordered to pay restitution in the amount of $300,000 to the victim of this offense. *See* 18 U.S.C. § 3663A; PSR ¶ 105. This amount reflects actual loss caused by defendant's conduct.

11

## CONCLUSION

For the reasons sets forth above and in view of the Section 3553(a) factors, the government respectfully requests that this Court impose a sentence within the advisory Guideline range of 24 to 30 months' imprisonment.

Respectfully submitted,

JOHN R. LAUSCH, JR.
United States Attorney

By: /s/ *Matthew S. Ebert*
MATTHEW S. EBERT
Assistant United States Attorney
219 South Dearborn Street, 5th Floor
Chicago, Illinois 60604
(312) 353-5354

Dated: April 13, 2018

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | Case No. 15 CR 525 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| STEVEN SEGURA | ) | |

## Certificate of Service

The undersigned Assistant United States Attorney hereby certifies that the Government's Sentencing Memorandum was served on April 13, 2018, in accordance with Fed.R.Crim.P. 49 and the General Order on Electronic Case Filing (ECF) pursuant to the district court's system as to ECF filers.

Respectfully submitted,

JOEL R. LEVIN
Acting United States Attorney

By: /s/ *Matthew S. Ebert*
MATTHEW S. EBERT
Assistant United States Attorney
219 South Dearborn Street, 5th Floor
Chicago, Illinois 60604
(312) 353-5354